(C. D. 1972)

SCIAKY BROS., INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided March 6, 1958)

*John D. Rode* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General *(Henry J. O'Neill*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Merchandise described in the consular invoice as "Copper Plate (½" x 19" x 51⅛")" was classified for duty by the collector of customs as an article, not specially provided for, partly or wholly manufactured, composed wholly or in chief value of copper, and duty was imposed thereon at the rate of 22½ per centum ad valorem as provided in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

By its protest, as originally filed, plaintiff claimed that the merchandise was entitled to classification as copper in plates and, accordingly, entitled to entry free of duty pursuant to the terms of paragraph 1658 of said act (19 U. S. C. § 1201, par. 1658). The protest was duly amended to claim alternatively classification of the merchandise as copper in sheets, dutiable at the rate of 1¼ cents per pound as provided in paragraph 381 of said act (19 U. S. C. § 1001, par. 381), as modified, *supra*.

As stated by counsel for plaintiff at the trial, "* * * the issue this morning will be whether the imported merchandise is dutiable as a manufacture of copper, or whether it is dutiable as copper in sheets, or whether it is free of duty as copper in plates."

The pertinent text of the statutes involved in the consideration of this case is here set forth:

Paragraph 397, as modified, *supra*, reads as follows:

Articles or wares not specially provided for, whether partly or wholly manufactured:

 * * * * * * *

 Composed wholly or in chief value of * * * copper * * *:

 Other * * *_____ 22½% ad val.

Paragraph 1658, *supra*, reads as follows:

Copper ore; regulus of, and black or coarse copper, and cement copper; old copper, fit only for remanufacture, copper scale, clippings from new copper, and copper in plates, bars, ingots, or pigs, not manufactured or specially provided for.

Paragraph 381, as modified, *supra*, reads as follows:

Copper in rolls, rods, or sheets_____ 1¼¢ per lb.

Plaintiff called one witness, Edward H. Jackson, and the defendant introduced the testimony of two witnesses, Henry C. Ashley and Clarence E. Lockwood.

Plaintiff's witness, Jackson, testified that he was the plaintiff's credit manager and aide to the owners of that concern, with which he had been associated for 16 years, and that his company manufactures electric resistance welding machines which are used in the fabrication of air frames, guided missiles, and so forth. He identified the merchandise as rectangular-shaped pieces of copper, one-half inch thick, 19 inches wide, and 51⅛ inches long, being composed of electrolytic copper. A sample of a piece of the material was received in evidence as illustrative exhibit 1.

Jackson stated that the merchandise was imported for use as secondaries in their transformers for spot and seam welders; that it was ordered in the particular size specified, it being the standard practice to order copper by lengths, widths, and thickness, by reason of the extreme expense involved.

The witness testified that, after importation, the first manufacturing operation is to use a bandsaw or Doall saw to cut the merchandise to the exact shape required; four holes are then drilled in certain parts of the material, after which the surface of the commodity is rough-polished to free it of any burrs which might cause resistance in the passing of the electric current. The article is then milled to exact dimensions.

A blueprint indicating how the imported material is manufactured into a secondary for transformers was received in evidence as illustrative exhibit 2. The portions of the exhibit marked A indicate where the corners of the plate are cut off in the first general sawing. The letter B marks the places where the holes are bored.

Jackson stated that, as imported, the article was not dedicated to any particular use, but it could be used for conductor bars and shunts as well as for secondaries for transformers. As stated by the witness, "It is used in the different forms; and [as] a conductor bar inside of one solid bar, they put two or three pieces together and shunt it together. It can be used in certain instances, but not as practical, although it is much cheaper than making conductor bars."

When asked if the subject merchandise is, in its imported condition, a raw material, the witness replied "According to commercial usage and term, and in the terms of National Production Authority, War Production Board, it was a raw material." In this connection, it should be pointed out that the witness stated that he handled all of the requirements of the War Production Board.

Jackson testified that he made no distinction between the terms

"plate" and "sheet," composed of copper, both being used for the same purposes.

Henry C. Ashley, called as a witness for the defendant, testified that he joined the Chase Brass and Copper Co., a subsidiary of the Kennecott Copper Co. and one of the three largest fabricators of copper in the United States, in 1934 as a general research laboratory assistant and, after 4 years, became testing engineer for the company, having supervision of its laboratory, and, in 1941, was placed in charge of the products control section. In 1955, he was made assistant metallurgical director for the company, having supervision of the process departments and technical contact with its customers in connection with sales. He examined exhibit 1 and was asked whether his company "as a part of its business activities rolls plate of that character," to which he replied in the affirmative.

Based upon his knowledge of his own company's operations and similar practices in other mills, he testified that, to produce merchandise represented by exhibit 1, the most economical method would be to "hot roll such material from a cast copper cake, approximately four inches in thickness, width and length determined by the particular mill upon which the operation was to be performed." The witness further testified that there is "at the present time an arbitrary limit established by the standards of our Copper and Brass Research Association, and recognized in the A. S. T. M. [American Society for Testing Materials] specifications for copper flat products," and that there was a well-defined distinction between a copper plate and a copper sheet. According to the specifications of the A. S. T. M., the maximum thickness of copper sheet would be three-sixteenths of an inch—the imported commodity being one-half inch thick. Copper plates, on the other hand, according to this witness, would have a minimum thickness of three-sixteenths of an inch, but with no stated maximum.

Clarence E. Lockwood, called as a witness on behalf of the defendant, testified that, since 1930, he had been sales representative for the American Brass Co., an operating subsidiary of Anaconda Co.; that, in his activities as sales representative, he had contact with many concerns who are national in their scope; and that he has done business with numerous concerns who operate in other parts of the country.

Lockwood testified as to the methods employed by his firm in producing merchandise, represented by exhibit 1, and also to his sales experience concerning such merchandise. When asked how his company sold merchandise, such as that represented by exhibit 1, he replied, "This particular gauge and size of sheet that is on this requirement would be sold as a copper plate."

Both plaintiff's witness, Jackson, and defendant's witness, Lock-

wood, testified that definitions and specifications of the terms "sheets" and "plates" overlap.

While plaintiff contends that the evidence establishes that the imported merchandise falls within the common meaning of the term "sheets," as used in said paragraph 381, it also contends that said merchandise is copper in plates, not manufactured or specially provided for, within the meaning of said paragraph 1658, and, hence, entitled to freedom from duty.

Plaintiff cites the following definitions of the terms "sheet" and "plate":

Webster's New International Dictionary

[sheet]

9 In general, a piece of anything, or an extent of some substance, that is usually very thin in relation to its length and breadth; * * * .

10 A broad, thinly expanded portion of metal or other substance; also, a plate forming part of a tank or boiler, regardless of thickness.

[plate]

1 A smooth, often nearly flat, and relatively thin, piece of any material, orig. only of metal; a thick sheet, slice or lamina; esp.; a perfectly flat sheet of material of uniform thickness throughout, as the back plate of a watch, etc.; a boiler or armor plate.

2 Metal in sheets, whether beaten, rolled, or cast.

Funk & Wagnall's New Standard Dictionary of the English Language

[sheet]

1 A very thin and broad piece of any substance * * * (3) A piece of metal or other substance hammered, rolled, fused, or cut very thin; as a sheet of tin; * * *.

[plate]

1 A flat, extended rigid body, as of metal, of slight thickness * * *.

and freely admits that "There seems to be no clear cut line of demarcation between copper in sheets and copper in plates." The testimony of plaintiff's witness, Jackson, and defendant's witness, Lockwood, supports that view.

The merchandise was invoiced by the shipper as copper plate, and it was entered by the importer as copper plate.

In its brief, defendant asserts, in point I, that "* * * the merchandise in question manifestly is not a 'sheet' but a 'plate' partly or wholly manufactured * * *."

Defendant's brief further asserts that "* * * through the uncontradicted testimony of defendant's two fully qualified witnesses, it has been established that the instant merchandise is known and sold in the wholesale trade as 'copper plate.'"

We are of the opinion, from an examination of the testimonial record, that the weight of evidence sustains the view above expressed by the defendant.

Having concluded that the importation is, in fact, copper in plates, it remains to be determined whether it is "not manufactured" within the meaning of said paragraph 1658.

The testimony of the plaintiff's witness, Jackson, is in substance that merchandise such as exhibit 1, representing the imported commodity, would be produced by hot-rolling a cast copper cake, approximately 4 inches in thickness, down to the condition of the imported commodity, which is one-half inch thick.

The testimony of Jackson indicates to our satisfaction that the imported commodity did not become copper plate, or copper in plates, until the hot-rolling process above referred to had been completed, and, hence, it was not in its imported state copper in plates, manufactured. It did not become copper in plates, manufactured, until the subsequent processes described by Jackson were applied in this country.

We have examined all of the authorities cited by counsel but find none of them controlling of the present issue.

Fifty years ago this court (then the Board of General Appraisers) in *B. F. Drakenfeld & Co. v. United States*, 15 Treas. Dec. 365, T. D. 28920, held that certain copper in plates, which had been planished and were ready for engraving, were excluded from the provision in paragraph 532 of the Tariff Act of 1897 as copper plates, not manufactured, but were properly dutiable as articles in chief value of metal.

In the course of its opinion the board, in construing the provisions of paragraph 532, *supra*, which enumerated "copper in plates, bars, ingots, or pigs, and other forms, not manufactured or specially provided for in this Act," made the following observation—

* * * We believe that paragraph 532 is to be read so as to include only such things as are crude or plate forms of copper obtained either by casting or rolling, and is not to be construed so as to include plates of copper which have been subjected to further processes resulting in an article advanced beyond such forms. * * *

As pointed out herein, the plates in controversy were, to apply the language above quoted, "plate forms of copper obtained * * * by * * * rolling."

Upon the record herein, and for the reasons above stated, we find and hold the merchandise in controversy is copper in plates, not manufactured, within the meaning of paragraph 1658 (19 U. S. C. § 1201, par. 1658), as claimed by the importer, and, therefore, nondutiable, and judgment will be entered accordingly.